UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAYER HEALTHCARE LLC,

                  Plaintiff/
                  Counterclaimant,

              v.

SERGEANT'S PET CARE PRODUCTS, INC.,

                  Defendant/
                  Counterclaim-Defendant.

Case No. 13-cv-2501 (JSR)
ECF CASE

**DECLARATION OF**
**AMANDA VAN AUKEN**

I, AMANDA VAN AUKEN, say and declare as follows:

        1.      I am Senior Marketing Director for Defendant/Counterclaimant Sergeant's Pet Care Products, Inc. ("Sergeant's"). I have been employed by Sergeant's since July 2003. I respectfully submit this Declaration in opposition to Plaintiff/Counterclaim-Defendant Bayer Healthcare LLC's ("Bayer") Motion for a Preliminary Injunction.

        2.      This Declaration is based upon my personal knowledge and my review of relevant documents.

        3.      Attached hereto as Exhibit A is a true and correct copy of excerpts of *Pet Supplies and Pet Care Products in the U.S.*, 9th Edition, July 2012, published by Packaged Facts, a leading producer of market intelligence reports for consumer products, including pest control controls.

History of Sergeant's Pet Care Products

        4.      Sergeant's is one of America's best-known and most respected manufacturers and marketers of pet supplies, and the Sergeant's brand carries a reputation among consumers for dependable, reliable and quality products.

5.      Sergeant's is America's oldest full-line pet supplies company, "with a long and venerable history in flea/tick products" and "a particularly strong presence in the mass-market channel and with an iconic consumer brand." *See* Ex. A at 97.

6.      Nearly 150 years in existence, Sergeant's was founded in 1868 in Richmond, Virginia by pharmacist Polk Miller, who formulated various healthcare products for pets in his pharmacy, first for use with his own beloved pets and later for friends' pets. As demand grew and he began to sell the products from his drugstore, he named them after one of his favorite dogs, "Sergeant."

7.      From its very beginning, Sergeant's was an early leader in research, development, and manufacturing of pet products.

8.      Demand for products to treat and prevent flea and tick infestations has prompted Sergeant's to introduce various improved flea and tick products including spot-ons, sprays, powders, and shampoos.

9.      In 1928, Sergeant's medicines and dog food were chosen for the sled dogs by the Commander Richard Byrd expedition to the South Pole.

10.      In 1962, Sergeant's played a key role in the invention of flea collars, introducing the Sentry flea collar, a major advancement in protecting pets from these parasites.

11.      In the 1970s, Sergeant's continued its growth, expanding into grocery stores nationwide.

12.      In 1989, Sergeant's relocated its corporate headquarters to Omaha, Nebraska, where it remains to this day.

13.     Dedication to research and development continued, and in the 1990s, Sergeant's introduced over-the-counter ("OTC") squeeze-on topical pest control products for pets in the retail channel.

14.     Today, Sergeant's produces and markets a wide array of pet care products, including flea and tick treatments in the form of squeeze-on products, shampoos, powders and sprays, flea and tick collars, yard sprays and household sprays, powders and foggers, natural flea and tick treatments, healthcare products, behavior products, dog and cat treat products, dog and cat toys, and dental care products.

The Flea and Tick Treatment Product Marketplace

15.     Over 2,000 companies compete in the U.S. pet supplies market, and the number of participants is continually growing at a regular pace. *See* Ex. A at 8.

16.     Flea and tick products are the top-selling dog product, accounting for one-quarter of dog supply sales during 2011 (including vet channel products). *See* Ex. A at 39-40.

17.     72% of dog or cat-owning households (or 44 million) buy flea and tick care products for their pets. *See* Ex. A at 304.

18.     Topical flea and tick treatments, or "spot-ons," the largest segment of the flea and tick care market, have traditionally fallen into one of two categories: those brands available exclusively or primarily through the veterinary channel and those brands sold at retail (OTC). *See* Ex. A at 102, 103. The veterinary side has traditionally been dominated by products from Merial and Bayer. *See* Ex. A at 103. The retail side has traditionally consisted of brands such as Central Garden & Pet (maker of Bio Spot), Hartz (maker of Hartz UltraGuard) and Sergeant's (maker of Sentry Fiproguard and Sergeant's Pronyl products). *Id.*

19.     Topical spot-on formulations are by far the most popular type of flea and tick care product, purchased by 46% of dog or cat owning households. *See* Ex. A at 304.

20.     The flea and tick treatment product market largely consists of two different types of consumers: 1) those that purchase products to kill an existing pest infestation on their pet (treatment), or 2) those that purchase products in order to prevent a pest infestation in the first place.

21.     The first group of consumers are primarily interested in a product that works fast, i.e., that kills pests in as short a time period as possible, so as to relieve their pet's discomfort or chance of harm, and to prevent any further spread of the infestation.

22.     The second group of consumers are primarily interested in products that reduce the chance of infestation in the first place and have a sustained, long-lasting effect.

23.     By income level, use of flea and tick treatment products tilts strongly to households with an income under $25,000, as does purchase of Sergeant's products. *See* Ex. A at 307.  Publicly available data indicates Bayer's Advantage products generally is purchased by upscale demographic consumers, with households with an income of $150,000 or more as prime users. *Id.*

24.     Merial's Frontline products are by far the most popular and purchased brand of flea and tick care product purchased, commanding 32.7% of the market. *See* Ex. A at 304.

The OTC Marketplace

25.     As stated above, Sergeant's was a pioneer in offering quality affordable pet care products in the non-prescription, non-veterinary markets, for example in bringing OTC squeeze-on topical pest control products for pets to the retail channel.

26.     Sergeant's is long-established in the non-prescription, non-veterinary markets, expanding into grocery stores in the 1970s, drugstores, and, since 2004, into large national pet stores such as PetSmart and PetCo.  Sergeant's brand OTC products can be found in a wide variety of national retail outlets, including Walmart, Safeway, Target and Kroeger.

27.     From the beginning, Sergeant's has always been an OTC branded company, with the aim of offering products of the same quality and efficacy as those distributed in veterinary channels, but at a lower price.

28.     In recent years, a number of flea/tick care topical treatment companies that historically sold their products in the veterinary/prescription channels have attempted to move into the OTC market by selling products through retailers.  *See* Ex. A at 23.

29.     In March 2010, Bayer introduced its Advantage and K9 Advantix products to pet specialty retailers, a realm that had traditionally been Sergeant's sales space, with PetSmart being the first national pet store to carry the brands.  *See* Ex. A at 103.

The Development of Sergeant's MAX Products

30.     Sentry Fiproguard MAX and Pronyl OTC MAX (the "MAX Products") combine cyphenothrin with fipronil.

31.     Through ongoing research and development, Sergeant's discovered that cyphenothrin was a very effective chemical for kill speed, and when combined with fipronil, yielded products with both very impressive efficacy and speed.

32.     Sergeant's has the exclusive rights to the only EPA-registered source of the chemical cyphenothrin in the United States for use on companion animals.

33.     Sergeant's has obtained multiple EPA registrations for squeeze-on products using the fipronil + cyphenothrin combination.

34.     Sergeant's first sold its MAX Products beginning in January 2012.

35.     Sergeant's invests substantial time and money into the process of planning, conducting, and analyzing efficacy and speed studies relating to its products. Sergeant's undertook such studies in connection with its MAX Products.

36.     Any given study requires months of careful planning, investigation, and examination.  Sergeant's must identify the issue to be studied, develop a budget, and then engage an independent testing facility and researchers to design, execute, and analyze the study.

37.     Such studies take upwards of a year, from identifying the issue to be studied through to the completion of the study report.

38.     Efficacy and speed studies, such as those that Bayer challenges in this matter, can cost hundreds of thousands of dollars.

Sergeant's Was Aware of Bayer's Prior "Bubble" Advertising Prior to Running the Fiproguard Commercial

39.     Before Sergeant's began to run the Fiproguard commercial at issue in this case (the "Fiproguard Commercial"), Sergeant's was aware of Bayer's own television advertising featuring animation of pests, in the form of a fighter jet "divebombing" a dog, only to be repelled by a "bubble" around the dog (the "Bayer Bubble Commercial").

40.     Sergeant's was unaware of any objection of false advertising concerns arising from the use of the hyperbolic animation in the Bayer Bubble Commercial.

41.     Knowing that the Bayer Bubble Commercial had run in the past, Sergeant's did not perceive any issue with the Fiproguard Commercial.

42.     Indeed, other advertisers in the pest control market are presently using bubble animation in their television commercials. I am aware that S.C. Johnson & Son Inc. has run a television commercial for its OFF! product which features people protected from insect attacks by computer-generated bubbles. *See* Declaration of Tyler E. Baker, Esq., Exhibit A-4.

Bayer Was Aware of Sergeant's Fiproguard Commercial From the 2013 Global Pet Expo

43.     Sergeant's attended the 2013 Global Pet Expo (the "Global Pet Expo") at the Orange County Convention Center in Orlando, Florida, February 20-22, 2013, to promote its products. Sergeant's had had two booths at the Global Pet Expo, numbers 2615 and 2601. I attended the first day and a half of the Global Pet Expo.

44.     Bayer also attended the Global Pet Expo, and was assigned to booth number 3221. Attached hereto as Exhibit B is a true and correct copy of the floor plan of the Global Pet Expo with booth numbers listed and Sergeant's and Bayer's booths noted.

45.     Sergeant's and Bayer's respective booths at the Global Pet Expo were in very close proximity to each other, and in the same section of the convention space floor.

46.     At the Global Pet Expo, Sergeant's prominently displayed the Fiproguard Commercial on sizeable video screens as part of a continuous commercial reel for all three days of the convention.

47.     As is the usual practice of representatives attending the Global Pet Expo, Sergeant's representatives toured the convention space, inspecting competitor's booths to view their offerings. I viewed Bayer's booth to see their marketing spin on a new flea collar they were promoting. I believe that Bayer representatives likewise visited the Sergeant's booth.

Sales of Sergeant's Products Are Significantly Down for 2013

[text redacted]

Harm to Sergeant's Were the Court to Issue a Preliminary Injunction

50.    The issuance of a preliminary injunction here, one that would require Sergeant's to cease or amend its 2013 advertising campaign and to "recall from all channels of distribution" Sergeant's advertising identified in the Complaint, in addition to harming Sergeant's goodwill and costing Sergeant's its advertising budget for the 2013 season, would severely injure Sergeant's in immediate, tangible ways.

51.    All packaging for the MAX Products in the marketplace feature "starts to kill within minutes" language that Bayer alleges cannot be supported by Sergeant's studies.

52.    There are currently hundreds of thousands of units of completed packages (and printed packaging) for the MAX Products. These products are located throughout the distribution cycle, from production and shipping from our manufacturing facilities, to product fulfillment, to retailer shelves.

53.    Recalling this packaging would be an extraordinarily massive undertaking, given the distribution of the MAX Products across the United States.

54.    A product recall in the midst of flea and tick season would be catastrophic to Sergeant's.

55.    Additionally, the expense, time, and resources that would need to be invested in creating new packaging both for new and recalled products would be immense.

56.     An additional harm to Sergeant's from Bayer's attempt to have Sergeant's MAX Products studies be deemed inadequate in this proceeding arises from the fact that the products at issue are closely regulated by the United States Environmental Protection Agency.

57.     If a preliminary injunction were to issue and the Court rule that Sergeant's studies are unacceptably flawed, I understand that Sergeant's could have an obligation to report that information to the EPA, which would lead to an entirely new regulatory review for the Sergeant's products whose claims rely on such studies.  Any such EPA review of the MAX Products would cost Sergeant's considerable amounts of money and could take substantial time.

58.     While any such review was pending before the EPA, I understand that Sergeant's could not advertise or sell its products using any of the claims which Bayer challenges by attacking Sergeant's studies.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this Declaration on May 14, 2013 at Omaha, Nebraska.

AMANDA VAN AUKEN