David H. Bernstein (dhbernstein@debevoise.com)
Michael Schaper (mschaper@debevoise.com)
Christopher Hamilton (cjhamilton@debevoise.com)
Zheng Wang (zwang@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

Attorneys for Plaintiff Bayer HealthCare LLC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
BAYER HEALTHCARE LLC,                          :
                                               :
               Plaintiff,    :
                                               :     13-cv-2501 (JSR)
   vs.                                         :     ECF CASE
                                               :
SERGEANT'S PET CARE PRODUCTS, INC.,            :
                                               :
               Defendant.    :
                                               :
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## REPLY DECLARATION OF HAL PORET

I, Hal Poret, declare as follows:

    1.    I am over the age of 18 and competent to testify. I submit this declaration on personal knowledge in further support of Bayer HealthCare LLC's ("Bayer") Motion for Preliminary Injunction.

## BACKGROUND AND PURPOSE

    2.    I previously submitted an Expert Report in this matter concerning a survey I conducted regarding a Fiproguard Max television commercial. I have now been provided with a rebuttal report from Jacob Jacoby. Debevoise & Plimpton, LLP,

attorneys for Bayer, have asked me to provide my opinions regarding the Jacoby Report. This report details my opinions. In the course of reviewing the Jacoby Report and preparing this Reply Report, I reviewed the following materials (in addition to those noted in my original report: (1) Jacoby Rebuttal Report and Declaration; (2) Pet Supplies and Pet Care Products in the U.S., 9th Edition (July 2012) (Exhibit 2 to Poret Deposition); (3) Field Report from my survey (showing the incidence of qualification); (4) Sergeant's Opposition Brief (redacted). Time in connection with this matter will be billed at my ordinary rate of $500/hr. My qualifications and CV including list of testimony and publications are included in my original Expert Report.

### SUMMARY OF OPINION REGARDING JACOBY REBUTTAL

3. At the outset I would note that the Jacoby Rebuttal report raises no criticisms regarding the following major aspects of the survey: (1) the main survey questions addressing the sole issue on which I stated an opinion -- whether the product repels or kills fleas before or after they come in contact with the pet; (2) the propriety of the control; or (3) the interpretation of the data supporting the lone conclusion stated in the report (the data from Question 3b showing a 14% net difference between those who answered in the Test and Control group that the product repels or kills fleas before they come in contact with the pet).

4. The criticisms in the Jacoby Rebuttal primarily amount to what I consider minor disagreements over the wording or order of screening questions and instructions, and other minor issues that any two researchers could debate but do not meaningfully impact the reliability of the results. The few substantive issues Dr. Jacoby raises are easily explained to be without basis. Accordingly, the Jacoby Rebuttal does not cause me

to change my opinions expressed in my Expert Report. The specific criticisms raised by the Jacoby Rebuttal are discussed individually below.

5. I have also noted that attorneys for defendant raise other criticisms that Dr. Jacoby does not himself make in his report (although citing to portions of the Jacoby Report that have no connection to the arguments counsel makes.) I will also address several of these points below.

### RESPONSE TO SPECIFIC CRITICISMS IN JACOBY REBUTTAL

### I. The Survey Did Not Test Every Allegation in the Complaint

6. The first criticism in the Jacoby Rebuttal is that the survey only tested two of the eight allegations in the Complaint (paragraphs 11-12). There is nothing improper about a survey testing less than all issues raised in a lawsuit. A survey researcher's role is not an advocate trying to meet the plaintiff's burden of proof on all its claims. I was retained to design a survey to test questions related to two issues and I only stated conclusions related to those two issues. The fact that the survey did not test additional issues is not a flaw and has no bearing on the reliability of the survey and my conclusions.

### II. The Survey Universe

7. The Jacoby Rebuttal also asserts that the universe was overbroad. Dr. Jacoby, however, points to no data or evidence of any kind to support this assertion.

#### A. Screening question about "pets"

8. Dr. Jacoby first asserts that the universe is overbroad because the key screening question asked about likely purchase of a topical product for controlling fleas

3

on "pets" rather than dogs and cats specifically (paragraphs 13 – 16).  Dr. Jacoby points out that there are other types of pets (such as gerbils, hamsters, birds and rabbits).  According to Pet Supplies and Pet Care Products in the U.S., 9th Edition (supplied to me by counsel for Sergeant's at my deposition), 91% of pet supplies are purchased for dogs and cats.[1]  Since topical flea and tick control products like Fiproguard Max are only intended to be used for dogs and cats, the percentage of such products that are purchased for dogs and cats specifically is likely well above 91%.  Accordingly, it is inevitable that almost all respondents who answered that they are likely to purchase a topical flea control product for a pet were thinking of a dog or cat.  Dr. Jacoby is merely speculating about the possibility that a negligible percentage of respondents who answered that they are likely to purchase a topical flea control product meant that they would purchase one for an animal other than a dog or cat.  Even if this were true, it would have no meaningful impact on the reliability of the survey.

      9.     The *Seattle Storms* case Dr. Jacoby cites on this point only demonstrates how negligible Dr. Jacoby's comment is.  That case concerned soccer camps and a survey that screened only for parents generally.  Since a very large percentage of parents do not send their children to soccer camps, screening only for parents would clearly result in a very overbroad universe in that only a small percent of parents who qualified for the survey would actually be prospective customers of a soccer camp.  The present situation is at the opposite end of that spectrum.  Since all but a tiny percentage of the relevant products are sold for use with dogs and cats, at most a tiny percentage of respondents

---

[1] Pet Supplies and Pet Care Products in the U.S., 9th Edition (July 2012), page 6.

who are likely to purchase a topical product for controlling fleas based this response on another type of pet.

### B. The Universe Was Not Limited to Pet Specialty Retailers

10. Dr. Jacoby also asserts that the universe needed to be limited to those likely to purchase products at pet specialty retailers because that is where Fiproguard Max is sold (Paragraph 17). This position is baseless. The survey is not testing a consumer experience shopping in a store, the survey is testing perception of a television commercial that is seeking to interest consumers in the product.[2] A commercial for Fiproguard Max is targeting not only customers of Fiproguard Max but also customers of other topical flea and tick control products, customers of other types of flea and tick control products and pet owners who don't currently use any product but may be incented to start using one. Accordingly, the proper universe for such a survey consists of prospective purchasers of this <u>type</u> of product generally, not only those who specifically purchase Fiproguard Max. It would be unreasonable to limit the universe to only those who shop in certain outlets when a large part of the aim of a commercial is to induce new customers to purchase the product, including those that didn't previously know about the product or where it is sold. (Again, this is also an entirely negligible issue, as the question of whether or not people shop at certain pet stores has no bearing on their perception of the commercial's message about how the product works).

---

[2] I will note here that counsel for defendant inappropriately cites trademark cases in which surveys were criticized for not screening for people who shop in the outlets where the product is sold. Such surveys were criticized because trademark confusion surveys typically concern perception in a purchasing situation, so naturally consumers would only be subject to confusion if they shop where the products are sold. TV commercial surveys are an entirely different situation because TV commercials are not viewed where the products are sold and seek to gain new customers, including those who don't presently purchase the advertised product or shop where it is sold.

### III.    The Survey Sample

11.    Dr. Jacoby next asserts that the sample was not representative of the relevant universe (paragraph 18) due to issues relating to age/gender and geography. On the topic of age and gender, Dr. Jacoby simply misunderstood how the sample was selected. Dr. Jacoby misleadingly implies that the sample was proportionate to U.S. Census data, which could be inconsistent with the category of purchasers of the relevant product. In fact, the method for selecting the sample is well designed to mirror the demographics of the relevant category. By using census data to determine the number of <u>screenings</u> within each age and gender group, the survey ensures that any skewing of mall populations is not an issue. However, the number of screenings does not dictate that the final sample is proportionate to census data. To the contrary, the screening quota system ensures a reasonably representative final sample because if members of one age/gender group are more likely to purchase topical flea control products than another group, the former group will qualify for the survey at a higher rate and have higher representation in the final sample. In this way, the survey naturally self-weights the final sample in proportion to the rates at which each age/gender group actually purchases the relevant product. Had Dr. Jacoby examined the survey data, he would have seen that the final sample is not proportionate to general census data, but includes a disproportionately large percentage of people between 18 – 34 and a lower percentage of people age 50 and over, reflecting the fact that dog ownership (and therefore purchase of flea control

products for dogs) is higher among the youngest age group and lower among the oldest age group.[3]

12.     As pertains to geography, Dr. Jacoby asserts that topical flea and tick product usage is appreciably higher in the Northeast and Southeast regions and appreciably lower in the Central, Southwest and Pacific regions and that the survey inappropriately apportioned respondents equally to different regions of the U.S.  First, the data Dr. Jacoby cites regarding geographical product usage suggests fairly small regional differences.  For example, the "appreciably lower" rates for the Central and Southwest regions Dr. Jacoby refers to amount to these regions being 9% and 7% less likely to use these products, and the higher rates for the Northeast and Southeast amount to purchase at 16% and 17% higher than average.  Accordingly, the precise distribution of respondents across the different regions is of negligible significance as the regional variations are minor.  Second, had Dr. Jacoby looked at the locations used in the survey, he would have seen that they happen to be reasonably consistent with his view of the market.  25% of the locations used were in the Northeast (Boston, Hicksville and West Nyack).  Another 25% were in Florida (which is surely in the Southeast) or Houston (which is in or near the Southeast), which means the two regions he deems the most important each accounted for roughly 25% of the survey, whereas the remaining 50% of

---

[3] One example of a website referring to this fact is: http://btoellner.typepad.com/kcdogblog/2012/11/us-pet-ownership-statistical-breakdown.html.  This is a blog that refers to a 2011 survey indicating that 58% of 18 – 24 year olds own dogs as compared to only 32% for those 65 and older.  This is just one example of support for how the screening quota method I described did produce a final sample that is consistent not with overall census data but with the specific breakdown of purchasers of the relevant type of products.

7

interviews were divided across the other three regions that he deems less important (meaning they were represented at relatively lesser rates in the final sample).

13. Regardless of the number of sales in each region, the fact remains that these products are sold nationally and the commercial, at least to the extent it is on Sergeant's website, is viewable nationally, so it is appropriate to collect the opinions of a nationally-dispersed sample. This is not a situation where a product is sold in only one state or region and thus only the opinions of consumers in that region are relevant.

IV. **Wording/order of Screening Questions**

14. Dr. Jacoby also makes a number of comments on the screening questions (paragraphs 20 – 24). These include: (1) that he believes the occupation question should have been asked after the likelihood of purchase question; (2) that he believes the word "topical" was not appropriate for the relevant type of products; and (3) that respondents may not have known what the screening question meant by a product "controlling" fleas and ticks. Dr. Jacoby points to no support for the merit of any of these supposed criticisms.

15. I see no basis for arguing that it is more reliable to put the "occupation" question after the likelihood of purchase question.[4] Likewise, I see no basis for

---

[4] Indeed, if the occupation question is asked <u>after</u> the respondent has already been asked the chief screening question about topical flea control products, the respondent might be more likely to realize that answering that they work for a company that sells pet products will disqualify them, which would somewhat impair the effectiveness of the question.

speculating that respondents who are likely purchasers of the relevant type of products would be confused by the reference to products used for "controlling" fleas and ticks. [5]

16.     Regarding the word "topical," Dr. Jacoby's comment that respondents would not understand this term is pure speculation and flies in the face of pet product industry common usage and ordinary consumer experience.  As the Pet Supplies document that Dr. Jacoby cites confirms, the word "topical" is highly standard to refer to the relevant type of product.  Given that this document uses the word "topical" countless times in tables showing consumer data (which obviously comes at least in part from consumer surveys), it is likely that this is the word used in the consumer surveys the pet industry conducts to obtain the relevant data.  It is also my belief that the use of the word "topical" as indicating that a product is applied to the surface of the body is commonly understood by consumers in general, as the word "topical" is similarly used in the context of medications and healthcare/skincare products that most consumers have experience with. [6]

17.     At the end of the day, the only relevance of all of these issues is whether the screening questions produced a group of respondents that are actually purchasers of the relevant type of products.  The data shows that this is the case.  According to the Pet

---

[5]     According to dictionary.com, "controlling" means, inter alia, "to eliminate or prevent the flourishing or spread of."  I have no reason to believe that respondents would not understand that dictionary meaning of the word "controlling," and Dr. Jacoby has not pointed to any empirical evidence showing that respondents do not understand the meaning of that common term.

[6]     Dictionary.com defines topical, in the context of a medicine, as "of, pertaining to, or applied externally to a particular part of the body."  Again, I have no reason to believe that respondents would not understand that dictionary meaning and Dr. Jacoby has not pointed to any empirical evidence (other than his own, potentially idiosyncratic experience) showing that respondents do not understand this meaning of that common term.

Supplies report (p. 304), approximately 44 million households own a dog or cat. This amounts to approximately 38.3% of U.S. households. The Pet Supplies report indicates that 45.8% of households with dogs and cats used topical flea and tick control products, which means that approximately 17.5% of U.S. households use topical flea and tick control products (45.8% of 38.3%). This means that properly understood screening questions asking about purchase of topical flea and tick control products would be expected to yield roughly 17.5% of U.S. consumers answering that they do purchase such products. In my survey, the incidence was approximately 17% -- i.e., 17% of those who were asked the screening questions qualified. This strongly confirms that the screening questions produced a population of properly qualified respondents who understood what product was being asked about. It also confirms that the universe was not substantially overbroad as Dr. Jacoby claims, as the rate of qualification was no higher than the incidence of purchasers of this type of product in the overall population.

V.  **Other Wording Issues**

  A.  **Wording of Question 2b**

18.  Dr. Jacoby criticizes the phrase "within minutes" in Question 2 (pertaining to how effective the product is) as ambiguous (paragraph 25). Although I disagree, it is sufficient to respond that this issue is irrelevant since I did not state an opinion of implied falsity regarding the issue Question 2 tested. The responses to Question 2 are not the basis for the opinion stated in my report. Again, Dr. Jacoby makes no criticisms at all of the question that produced the data my opinion relies on (Question 3).

    B.    **Wording of Instructions**

    19.    Dr. Jacoby also makes the following criticisms of the wording of instructions: (1) use of the words "please do not guess" rather than "you should not guess"; (2) instructing respondents they were free to answer that they have "no opinion" but not including the words "don't know"; (3) that the instruction to "please answer all questions" would somehow negate the immediately following explanation that if they have no opinion to any question they should say so and to please not guess; and (4) that the instruction about repeating something the respondent said "in a previous question" should have been worded "in answer to a previous question (paragraphs 26 and 27). I think it was perfectly clear to respondents that they were not required to provide an answer if they did not have one and that they were being asked not to guess. The data bears this out, as 37% of respondents answered "don't know" or "no opinion" to at least one survey question. This evidences a clear understanding that such answers were acceptable options. In addition, the Control Group was completely effective for controlling for guessing, and weeded out whatever tendency to guess was not suppressed by the instructions.

## VI.    Interpretation of the data

    A.    **Coding**

    20.    Dr. Jacoby asserts that the results should have been coded by independent coders rather than me (paragraph 28). This criticism fails to account for the fact that a major portion of the data underlying my conclusion is objective, closed-ended data that involved no coding at all. The 14 percent net difference in the Test and Control Group

rate of answering that the product repels fleas before they contact the pet involves closed-ended "before" answers.  No coding is involved at all.

21.     The only relevant coding involves the group of 64 Test Group respondents whose answers as to why they answered "before" point to the graphical depiction of the bubble or force field.  Remarkably, while Dr. Jacoby quibbles (inaccurately) about specific verbatim responses from the earlier questions, Dr. Jacoby does not point to a single instance in which he disagrees with my coding of these 64 respondents.  Had he believed I coded anyone inaccurately, he could have simply pointed this out.  In any event, I do not believe there is anything improper about my taking responsibility for classifying responses on which my opinions rest.  Every verbatim response that I believed pointed to the bubble graphics is laid out in the body of the report so that the Court can easily review and evaluate them and the entire coding process is transparent.

22.     Although Dr. Jacoby refers to my discussion of the verbatim responses as a "stratagem," I fail to see what is improper about suggesting that the reader review the verbatim responses of Test Group respondents to get a good sense of what is driving their answers.  Review of the verbatim responses is a proper and useful tool for better understanding how respondents perceived the commercial.

        B.     **Significance of the 14 percent net result**

23.     Dr. Jacoby takes issue with my stating that the 14 percent net result indicates that the survey did cause an appreciable number of respondents to take away a false message (paragraphs 29 – 31).  In stating this conclusion, I am stating a research conclusion that the survey has measured a meaningful tendency of the commercial to

mislead, as opposed to that it measured something that could be dismissed as noise created by a survey. Dr. Jacoby's criticism seems to be a legal opinion that a 14 percent net should not be considered actionable. He is not expressing an opinion that relates to survey methodology or analysis.

24. In terms of the legal significance of a 14 percent net, Dr. Jacoby's comments are misplaced. I do not believe there is an automatic minimum threshold for a survey result. Equally important, many of the cases that have resulted in citations to a 15 percent standard relate to surveys that had no control groups. A net 14 percent result after subtracting noise measured by a rigorous control group is dramatically more meaningful than a 14 percent test group result with no control.

    C.    **Discussion of initial open-ended responses (Questions 1 and 2)**

25. Dr. Jacoby claims that I improperly cite to verbatim responses from the initial open ended questions in an effort to increase the 14 percent net result from Question 3. This is false in several respects. First, Dr. Jacoby is mischaracterizing my citation to the initial open-ended responses. I never stated that I was aggregating additional responses from earlier questions with results from Question 3 in any way. I was simply pointing out that the significant trend of initial responses mentioning the bubble/force field or the idea of repelling fleas before they reach the dog shows that this topic was significant to respondents and justifies the subsequent focused questions that resulted in the 14% net result from Question 3.

26. Dr. Jacoby also inaccurately asserts that I stated that all of the initial verbatims I cited were false messages, and then proceeds to point out that some of them are ambiguous. Dr. Jacoby is unnecessarily challenging verbatims that I never claimed to

demonstrate false messages. I explicitly stated that these verbatims consisted of respondents who "mentioned the protective bubble or force field protecting the pet from fleas <u>or</u> explicitly stated that the product repels or kills fleas before they come in contact with the pet" (emphasis added). As these two clauses separated by the word "or" should make clear, I was identifying verbatims that explicitly played back a false message <u>or</u> brought up the topic of the bubble and force field. Again, the point was not that all of these verbatims demonstrate falsity, but that they demonstrate that the topic of the bubble/force field and the idea that fleas do not contact the pet were coming up in sufficient numbers in the initial open-ended answers to justify the need for subsequent closed-ended questions to resolve whether or not respondents took away a false message due to the bubble depiction.

### VII. <u>Testing for Puffery</u>

27. Dr. Jacoby also asserts that the survey should have asked questions about whether respondents perceived the commercial as puffery (paragraph 32). This is a highly irregular and non-standard suggestion for which I see no basis. A survey inherently measures whether a commercial is perceived as puffery by asking questions that determine whether or not respondents took away a specific claim. If respondents answer that the commercial communicated that the product repels fleas before they come in contact with the dog, this means that they took away a specific message and that they did <u>not</u> perceive the commercial as puffery. If they did perceive the commercial as puffery, they would have answered that the commercial did <u>not</u> communicate a message on this topic (and the control group would have accounted for any tendency to play back certain messages even in the absence of misleading content.)

28. It is also worth noting that Dr. Jacoby's comment that some respondents indicated that aspects of the commercial could not be real is misplaced. The issue is not whether respondents think the graphic depiction of the force field is literally real. The issue is whether such a depiction <u>implies</u> that the product works in a manner that would repel fleas before they make contact with the pet. The fact that some respondents evidently realize that fleas do not literally pilot fighter jets in no way addresses the issue of whether they believe the bubble depiction to convey that the product repels fleas before contact in a more feasible manner.

## VIII. <u>Interpretation of Control Group Verbatims</u>

29. Finally, Dr. Jacoby takes issue with my observation that I believe the Control Group result for Question 3b was somewhat inflated due to the control commercial still retaining some imagery of fleas attacking the dog and seeming to be destroyed or failing to reach the dog even with the bubble image removed (paragraph 33 - 34). Dr. Jacoby does not, however, deny that 10 of the 15 verbatim Control Group responses I cited clearly show this to be the case. While I disagree with his stance on the other 5 verbatims, these verbatims could be ignored and my observation about the Control Group results would still be valid. It should also be emphasized that my comment on the Control Group is merely an observation that the control was very conservative and that the 14 percent net is a conservative estimate of the deception level.

## IX. <u>Arguments Raised by Counsel</u>

30. Counsel for defendant also raises several additional criticisms that are unsupported by anything in the Jacoby Rebuttal.

    A.    **Comments on the Universe**

31.    In addition to Dr. Jacoby's comments addressed above, counsel argues (p.14) that Sergeant's products are purchased by particular income, gender and age groups. Given Dr. Jacoby's numerous comments on the universe, he would have made such a criticism if this had any validity. To the contrary, there is no basis for suggesting that the universe should be structured based on Sergeant's customer base. As noted above, the proper universe for a survey is prospective purchasers of the <u>type</u> of product advertised, not merely the defendant's existing customers. Clearly a commercial for Fiproguard Max (which explicitly compares the product to competitors and generally states that a dog is not protected without such a product) is targeting consumers who currently use other products or those who currently use none at all. The survey was properly structured to represent the demographics of the category of users of topical products.

    B.    **Comments on the Control**

32.    Counsel also argues the control was inappropriate. First, it needs to be pointed out that counsel's citation to the Jacoby Report to support this point is unsupportable. The Jacoby Report makes no criticism of the control at all. Dr. Jacoby's comments on the Control relate solely to the proper interpretation of some of the verbatim responses of Control Group members. Counsel's argument that the supposedly high noise level reflects problems with the survey also rests entirely on citation to a case that cuts in the opposite direction. In the *U.S. Polo Ass'n* case cited by counsel, a survey showing the <u>lack</u> of confusion was criticized because of a high noise level. The court cited to a Jacoby article stating that a high noise level may mean that the Control is

actually measuring some degree of confusion, which would therefore unfairly <u>reduce</u> the net confusion level.  Accordingly, the concern expressed about a high noise level is that it may mean the control is <u>too close</u> to the Test stimulus and would, therefore, artificially suppress any net confusion level (since the higher noise level would be deducted from the Test Group confusion level).  As this makes clear, the court's concern about the high noise level was that it would <u>suppress</u> confusion.  Likewise, the high noise level here only <u>reduced</u> the appearance of confusion.

33.  The *U.S. Polo Ass'n* case on which defendant's counsel relies is actually consistent with my observation about the Control Group results – that a somewhat elevated control result (coupled with the verbatim responses) suggests that the control may have retained some of the confusing elements and may be artificially reducing the net confusion level by counting some confusion as noise.  If there is, indeed, any concern over the noise level being high, the concern is that the control was too similar to the real commercial and <u>understated</u> the confusion level.  As I suggested in my original report, this is not a reason to criticize the survey but to regard the reported net confusion level as a conservative one that, if anything, could have been higher with a control that eliminated more elements of the test commercial.

## **CONCLUSIONS**

34.  For the foregoing reasons, it is my opinion that the criticisms regarding the survey have no merit, other than confirming my original observation that the control result may have been inflated, which reduced the net confusion level.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on May 17, 2013 in Sleepy Hollow, New York.

*Hal Poret*

Hal Poret